UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Shawn H., Sr.,

    Plaintiff,

    v.                               Civil Action No. 2:19-cv-113

Commissioner of Social Security,

    Defendant.

## OPINION AND ORDER
(Docs. 10, 18)

Plaintiff Shawn H., Sr., brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits (DIB).  Pending before the Court are Plaintiff's motion to reverse the Commissioner's decision (Doc. 10), and the Commissioner's motion to affirm the same (Doc. 18).  For the reasons stated below, Plaintiff's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further proceedings and a new decision.

## Background

Plaintiff was 36 years old on his alleged disability onset date of February 1, 2016.  He obtained his GED and completed two years of college while in the military.  (AR 211, 415.)  He has worked as a produce clerk/stocker at a supermarket; a logistics specialist and a private security detail worker in the

military; and an inventory/stock control clerk and a warehouse manager for the United States Army/Army National Guard. (AR 212–16, 240–42, 416.) He is married and has two children who were approximately ages 6 and 12, respectively, at the start of the alleged disability period. (AR 210.)

Plaintiff was a soldier in the United States Army for 16 years. He was deployed to Iraq in around 2005–2006, where he witnessed severe trauma and was involved in a serious accident resulting from an IED explosion. (AR 1828, 1996, 2004.) He separated from the Army in April 2017. (AR 1825.) Since his deployment, Plaintiff has struggled with posttraumatic stress disorder (PTSD), manifesting in chronic nightmares, exaggerated startle effect, hypervigilance, intrusive thoughts and memories, fatigue, anxiety, depression, anger, and poor social interaction with people. (AR 217–22, 414, 1828, 1833, 1995.) As a result of his PTSD, Plaintiff isolates from people, sometimes loses his temper, has a difficult time accepting criticism, and has negative thoughts that interfere with his ability to interact appropriately with others. He also suffers from sleep apnea, chronic headaches, ringing in the ears, lack of concentration, sciatic pain, knee problems, back pain, and neck pain. Plaintiff takes various medications for these impairments, including medical marijuana, but suffers from negative side effects including lack of appetite, lethargy, weight gain, rashes, and irritable bowels. (AR 233, 429–30.) As a veteran, he receives his treatment, medication, and therapy from the Department of Veterans Affairs (VA).

In June 2016, Plaintiff was determined to have a 100% disability rating with the VA, 50% for PTSD. (AR 583, 2143.) In May 2017, Plaintiff stated in a Function Report that his daily activities included cleaning the house, playing video games, doing yard work, cooking dinner, caring for his children, and coaching softball three times a week. (AR 431, 436.) A few months later, in July, Plaintiff told a consulting psychologist that his daily activities included caring for his children, preparing meals, doing yardwork, napping, and attending his daughter's softball practices and games. (AR 1834.) He reported that he could drive a car and do household chores including sweeping, mopping, vacuuming, cooking, washing dishes, and shopping. (AR 1837.) Almost a year later, in May 2018, Plaintiff testified at the administrative hearing of this matter that his typical day included napping, reading, walking his dog, doing household chores (with rest breaks), picking up his children from school, and watching his daughter's sporting events including softball games. (AR 228–29.) He stated that he had good days and bad days, and that the number of good versus bad days "always fluctuates," explaining: "[s]ome days are really bad, some days are not so bad," but noting that the pain was always there. (AR 227.)

In April 2017, Plaintiff filed his application for disability insurance benefits, alleging that he has been unable to work since February 1, 2016 due to PTSD, sleep apnea, tension headaches, left knee meniscal tear, lumbosacral strain, right shoulder tendonitis, cervical strain, right knee strain, tinnitus, and depression. (AR 11, 369, 414.) His application was denied initially and upon reconsideration,

3

and he timely requested an administrative hearing.  On May 2, 2018,
Administrative Law Judge (ALJ) Michael McKenna conducted a hearing on the
disability application.  (AR 206–46.)  Plaintiff appeared and testified, and was
represented by counsel.  A vocational expert (VE) also testified at the hearing.
(AR 239–45.)  On August 14, 2018, the ALJ issued a decision finding that Plaintiff
was not disabled under the Social Security Act from his alleged disability onset date
through the date of the decision.  (AR 11–26.)  Thereafter, the Appeals Council
denied Plaintiff's request for review, rendering the ALJ's decision the final decision
of the Commissioner.  (AR 1–3.)  Having exhausted his administrative remedies,
Plaintiff filed the Complaint in this action on July 1, 2019.  (Doc. 1.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability
claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step
requires the ALJ to determine whether the claimant is presently engaging in
"substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant
is not so engaged, step two requires the ALJ to determine whether the claimant has
a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that
the claimant has a severe impairment, the third step requires the ALJ to make a
determination as to whether that impairment "meets or equals" an impairment
listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§
404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her

impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ McKenna first determined that, although he had posted earnings/wages after the alleged disability onset date of February 1, 2016, Plaintiff had not engaged in substantial gainful activity since that date.  (AR 13–14.)  At step two, the ALJ found that Plaintiff had the following severe impairments: PTSD, major depressive disorder, degenerative disc disease of

the lumbar spine, and mild thoracic spondylosis.  (AR 14.)  Conversely, the ALJ found that Plaintiff's obesity and left knee meniscus tear (status post left knee surgery for meniscus tear) were nonsevere, but noted that he considered these impairments in conjunction with Plaintiff's severe impairments in formulating Plaintiff's RFC.  (*Id.*)  At step three, the ALJ determined that none of Plaintiff's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 14–16.)

Next, the ALJ determined that Plaintiff had the RFC to perform "medium work," as defined in 20 C.F.R. § 404.1567(c), with the following additional limitations:

> [The claimant] can frequently lift and carry 25 pounds and occasionally lift and carry 50 pounds.  He can sit[,] stand[,] and walk 6 hours in an 8-hour workday.  The claimant is limited to performing simple, routine tasks.  [He] is not able to perform fast[-]paced production or assembly line type work.  He is able to have occasional interactions with supervisors and coworkers[,] and incidental contact with the public.

(AR 16.)  Given this RFC, the ALJ found that Plaintiff was capable of performing his past relevant work as a produce clerk.  (AR 23–24.)  Alternatively, the ALJ determined that there were other jobs existing in significant numbers in the national economy that Plaintiff could perform, including the jobs of hand packager, machine packager, and industrial cleaner.  (AR 24–25.)  The ALJ concluded that Plaintiff had not been under a disability from the alleged onset date of February 1, 2016 through the date of the decision.  (AR 25.)

## <u>Standard of Review</u>

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. The substantial evidence standard is "very deferential," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). Nonetheless, in its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## <u>Analysis</u>

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence and is the product of legal error because: (1) the ALJ failed to properly weigh the medical opinions, and (2) the ALJ erred in his assessment of Plaintiff's daily activities and in his characterization of the observations of a Social Security employee who interviewed Plaintiff regarding the claim. (Doc. 10.) The Commissioner responds by reminding the Court of the deferential "substantial evidence" standard of review and asserting that the ALJ properly assessed the medical opinions and did not mischaracterize Plaintiff's daily activities or the observations of the Social Security employee. (Doc. 18.)

After considering these claims and reviewing the record, the Court finds that the ALJ erred in his analysis of the medical opinions and in his assessment of Plaintiff's daily activities, as discussed below, and thus remands for further proceedings and a new decision.

I.      **The ALJ Erred in His Analysis of the Medical Opinions.**

Plaintiff contends that the ALJ should have given more weight to the medical opinions of treating therapist Linda Stephens, MSW, LCSW, and treating psychiatrist Krista Lussier, MD; and less weight to the opinions of nonexamining agency consultant Katrin Carlson, PsyD.  The Court agrees.

A.      **New Regulation regarding Assessment of Medical Opinions**

For applications like this one, which are filed on or after March 27, 2017, the Social Security Administration has fundamentally changed how ALJs assess the medical opinions of treating sources.  The familiar and longstanding requirements of the "treating physician rule"—that ALJs must assign "controlling weight" to a "well-supported" treating source's medical opinions that are "not inconsistent with the other substantial evidence"; and that, if controlling weight is not afforded to these opinions, ALJs must apply certain enumerated "factors" in determining what weight to afford them, *see* 20 C.F.R. § 404.1527(c)(2)—are gone.  The new regulations, applicable here, provide that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."  20 C.F.R. § 404.1520c(a).  Rather, ALJs must "articulate . . . how persuasive [they] find all of the medical opinions and all of the prior administrative medical findings in [the] case record," *id.* § 404.1520c(b), considering the same enumerated "factors" as considered under the prior regulation, "as appropriate," *id.*

at § 404.1520c(a) (*see* "factors" listed at *id.* § 404.1520c(c)), and following the particular "requirements" listed in 20 C.F.R. § 404.1520c(b).

Under the new regulations, the "most important factors" to be considered when evaluating the persuasiveness of medical opinions and prior administrative medical findings are "supportability" and "consistency," *id.* § 404.1520c(a), "[s]upportability" meaning: "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be"; and "[c]onsistency" meaning: "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be," *id.* § 404.1520c(c)(1), (2).  The ALJ *must* explain how he "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings" in his decision.  *Id.* § 404.1520c(b)(2).  In addition, the ALJ "*may*, but [is] not required to," explain how he considered the following three factors, *id.* (emphasis added): (1) the medical source's relationship with the claimant, including the length of the relationship and the frequency of examination, (2) the medical source's area of specialization, and (3) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding," *id.* § 404.1520c(c)(3)–(5).  Where the ALJ has found two or more medical opinions to be "[e]qually persuasive"

(meaning "equally well-supported . . . and consistent with the record"), but not exactly the same, the ALJ "will articulate" how he considered these latter three factors. *Id.* § 404.1520c(b)(3).

## B.    Relevant Medical Opinions and ALJ Findings

### i.    Therapist Stephens

Therapist Stephens began treating Plaintiff in February 2016, usually seeing him on a biweekly basis, and consistently recording in treatment notes that Plaintiff struggled with anger, irritability, depression, anxiety, and sleep disturbances, among other mental issues.  (*See, e.g.*, AR 2043–77.)  In an undated letter to the State of Connecticut Bureau of Rehabilitation Services and Disability Determination Services, Stephens reported that Plaintiff "struggles everyday with PTSD and its symptoms and works diligently in treatment."  (AR 1825.)  Stephens further reported that Plaintiff experienced the following symptoms: "flashbacks, nightmares, hypervigilance, irritability, difficulty focusing, persistent negative beliefs about himself, isolation, feeling[s] of detachment[,] and the inability to experience happiness."  (*Id.*)  In May 2017, Stephens stated in a medical source statement that Plaintiff would rather isolate, was irritable and easily aggravated, and struggled to remain calm.  (AR 1830.)  Although Stephens recorded that Plaintiff's judgment and insight were within normal limits, his affect was congruent, he was alert and oriented, and he had normal thought content and characteristics of speech (AR 1828); Stephens noted that Plaintiff struggled with PTSD symptoms including flashbacks and nightmares, his mood was depressed, he

had difficulty staying focused, and he was easily distracted and suffered from a lack of focus and concentration (AR 1827–30).

e ALJ gave these May 2017 opinions "partial weight," stating that Stephens's "*generally benign findings* support [the ALJ's] conclusion that while [Plaintiff] has some functional limitations, he retains the capacity to perform simple and routine tasks within the parameters . . . [contained in the ALJ's RFC determination]."  (AR 19 (emphasis added); *see also* AR 20.)  Clearly, considering the excerpts cited above, describing Stephens's findings as "generally benign" mischaracterizes the record.

In August 2017, Stephens completed a second medical source statement, wherein she opined that Plaintiff's PTSD caused him to experience "frequent, intense flashbacks as well as nightmares," and that the disorder "impacts every aspect of [Plaintiff's] life."  (AR 1982.)  Stephens noted that Plaintiff "struggles with interactions in social settings and tends to isolate because of irritability and anger," and that Plaintiff "tends to be hypervigilant and easily startled and experiences great difficulty with focus."  (*Id.*)  Stephens opined that Plaintiff would likely be absent from work for more than five days per month due to these impairments. (AR 1987.)  Finally, on October 5, 2017, Stephens completed a third medical source statement, wherein she stated that, even though Plaintiff was committed to treatment, he continued to struggle with PTSD symptoms, including flashbacks, nightmares, irritability, anger, difficulty staying focused, and problems interacting with others.  (AR 1889–91.)  Stephens opined that Plaintiff "[a]lways" had a problem using coping skills, handling frustration, interacting appropriately with

others, responding appropriately to authority figures, and focusing long enough to finish simple activities or tasks. (AR 1891–92.)

The ALJ gave "less weight" to these October 2017 opinions, finding that the assessments that Plaintiff "always" has problems interacting with others, coping, and focusing long enough to finish simple tasks, "are inconsistent with [Stephens's] treatment notes, which don't document such a level of limitation." (AR 20.) The ALJ stated that Stephens's assessments "are also not consistent with the record as a whole." (*Id.*) The record, including Stephens's own treatment notes, does not support this finding, as discussed below.

### ii.    Dr. Lussier

Dr. Lussier, a psychiatrist at the Providence VA Medical Center, began treating Plaintiff in around August 2017. On October 16, 2017, Dr. Lussier completed a medical source statement, wherein she opined that Plaintiff had a "[l]imited ability" to use appropriate coping skills and handle frustration, and became "highly irritable" and used inappropriate language when confronted with distressful situations. (AR 1903.) Noting that Plaintiff had "a few interactions with VA providers where he . . . abruptly terminated a phone call or appointment and interpreted that the provider was not acting in his best interest and used harsh language and [was] unable to be redirected," Dr. Lussier further found that Plaintiff had a "[l]imited ability" to interact appropriately with others, respond appropriately to authority figures, and get along with others without distracting them or exhibiting behavioral extremes. (AR 2255.)

13

The ALJ gave "partial weight" to the opinions of Dr. Lussier, explaining that he "remain[ed] persuaded that [Plaintiff] could perform simple and routine tasks." (AR 21.)  The ALJ also explained that Plaintiff "is able to perform most daily activities" and "is functioning at a relatively high level despite his impairments," as evidenced by his ability to care for his children and perform most household tasks, and by his "generally benign" mental status examinations.  (AR 22.)  As with Stephens's findings, describing Dr. Lussier's findings as "generally benign" mischaracterizes the record, as discussed below.

### iii.    Dr. Carlson

On October 11, 2017, Katrin Carlson, PsyD, a nonexamining agency consultant, opined based on her review of the record that Plaintiff could do simple work for two-hour periods "in a setting without strict time/productivity expectations" and with "limited interactions" with coworkers, supervisors, and the public.  (AR 275.)  Dr. Carlson added that Plaintiff "can be irritable and reactive and is not well[] suited to working directly with the public or collaboratively with coworkers."  (*Id.*)

The ALJ "agree[d] with Dr. Carlson's assessment that . . . [Plaintiff] does not have marked or severe mental functional limitations or psychiatric symptoms." (AR 22.)  Moreover, the ALJ gave "great weight" to Dr. Carlson's opinions regarding Plaintiff's ability to do simple work, and he "adopt[ed]" Dr. Carlson's opinions regarding Plaintiff's ability to maintain socially appropriate behavior.  (*Id.*)

Without citing any evidence from the record including any other medical opinions, the ALJ justified his decision to give great weight to Dr. Carlson's opinions by stating that they are "well reasoned," made "largely [in] rel[iance] on the evidence of record," "very persuasive," "in [Dr. Carlson's] area of specialty," "well explained," and "consistent with the record as a whole." (AR 23.) This analysis is vague and conclusory, with no consideration of the conflicting opinions of the *treating* medical sources, and no acknowledgement of the facts that (1) Dr. Carlson did not treat Plaintiff, and (2) Dr. Carlson's opinions were made prior to Dr. Lussier's opinions were added to the record.

### C.   Analysis of ALJ's Assessment of the Medical Opinions

As discussed above, under the new regulations regarding assessment of the persuasiveness of medical opinions, the most important factors to consider are supportability and consistency in relation to the totality of the evidence. 20 C.F.R. § 404.1520c(b)(2); *see Reed v. Berryhill*, 337 F. Supp. 3d 525, 528 (E.D. Pa. 2018). Even though ALJs are no longer directed to afford controlling weight to treating source opinions—no matter how well supported and consistent with the record they may be—the regulations still recognize the "foundational nature" of the observations of treating sources, and "consistency with those observations is a factor in determining the value of any [treating source's] opinion." *Barrett v. Berryhill*, 906 F.3d 340, 343 (5th Cir. 2018) (citing 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2)). When treating sources provide opinions, the regulations naturally suggest that they will often be given greater weight because "the examining

relationship provides them with a better understanding of an applicant's condition."

*Id.* (citing 20 C.F.R. §§ 404.1520c(c)(3)(v), 416.920c(c)(3)(v)). The relevant

regulation states: "A medical source may have a better understanding of your

impairment(s) if he or she examines you than if the medical source only reviews

evidence in your folder." 20 C.F.R. §§ 404.1520c(c)(3)(v), 416.920c(c)(3)(v). The

Fifth Circuit explained:

> The role of an examining physician is twofold—their reports may
> contain ultimate opinions, but they also contain important factual
> observations. *Those observations about an applicant's mental and
> physical condition are the first building block in the disability
> determination. They are the primary source that medical consultants
> and vocational experts use to form their opinions.* Those opinions, akin
> to secondary sources, are less critical than the underlying observations
> because experienced ALJs can draw their own conclusions based on
> accurate medical information.

*Barrett*, 906 F.3d at 343 (emphasis added).

Here, the underlying factual observations contained in the treatment notes of

various treating sources support and are consistent with the opinions of treating

therapist Stephens and treating psychiatrist Dr. Lussier, particularly regarding

Plaintiff's ability to handle stress and interact with others due to his irritability,

anxiety, and anger issues. (*See, e.g.*, AR 631 ("episodic isolation for prolonged

periods"), 1087 ("[d]ecreased sociability continues to be a problem," "[s]ome angry

outbursts are occurring"), 1088 ("[t]here are signs of anxiety," "short attention span

is evident"), 1848 ("really angry and frustrated"), 1856 ("edgy" upon initial

presentation, "irritability" one of "most distressing" symptoms), 1859 ("[m]ood is

'angry' and affect is irritable"), 2077, ("agitated and hostile," "argumentative"),

2093 ("irritable edge when discussing topics he is passionate about," "affect is anxious"), 2114 ("irritable edge when discussing topics that bother him"), 2133 ("edgy," "noticeably upset," "withdrawn," "refused to cooperate"), 2147 ("can be a bit testy").)  The ALJ should have recognized this fact and given more weight to Stephens's and Dr. Lussier's opinions as a result.  Moreover, the ALJ should have considered that the opinions of Stephens and Dr. Lussier are consistent with each other (*compare* AR 1829–30, 1891–92, 1981–82, and 1984–85 (Stephens), *with* AR 1903 and 2254–55 (Lussier)), an important factor under the regulations, *see* 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion[] . . . is with the evidence from other medical sources . . . , the more persuasive the medical opinion[] . . . will be.").

Instead, a noted above, the ALJ inaccurately characterized the findings contained in Stephens's May 2017 opinions and in Plaintiff's mental status examinations overall, as "generally benign" (AR 19, 22), and found that Stephens's October 2017 opinions were inconsistent with the record (AR 20).  Regarding his analysis of Dr. Lussier's opinions, the ALJ relied on Plaintiff's ability to perform "most daily activities" and to function "at a relatively high level."  (AR 22.)  But in fact, the record reveals that Plaintiff had difficulty interacting with even his own medical providers, refusing to treat with two providers (Dr. Liu and Therapist Stephens), and that he exhibited irritability at many of his medical appointments. (*See, e.g.*, AR 2077, 2112, 2114, 2133, 2175.)  Furthermore, the ALJ did not consider that Dr. Lussier's own treatment notes supported and were consistent with her

opinions regarding Plaintiff's limited ability to interact appropriately with others. For example, in an August 2017 treatment note, Dr. Lussier recorded that Plaintiff was "edgy" upon initial presentation and that one of Plaintiff's "most distressing" symptoms was "irritability." (AR 1856.) Dr. Lussier also recorded that Plaintiff "sometimes require[d] redirection," was "occasionally difficult to interrupt," and presented with an angry mood. (AR 1859.) In an October 2017 treatment note, Dr. Lussier recorded that Plaintiff was "visibly irritable" and reported that he wanted to move to a more rural area "where he would be isolated from the general public" because he had "little tolerance" for people and believed isolating would "eliminat[e] triggers" for his anger. (AR 2112.) And in December 2017 and March 2018 treatment notes, Dr. Lussier again recorded that Plaintiff exhibited an irritable edge and an anxious affect. (AR 2093, 2104.)

Despite giving only "partial" and "less" weight to the opinions of treating sources Therapist Stephens and Dr. Lussier (AR 19, 20, 21), the ALJ gave "great weight" to the opinions of nonexamining agency consultant Dr. Carlson (AR 22). But the ALJ's analysis of Dr. Carlson's opinions is vague and conclusory, with no citation to the record, no consideration of the conflicting opinions of treating sources Stephens and Dr. Lussier, and no acknowledgement of the critical facts that Dr. Carlson did not treat or examine Plaintiff and made her opinions prior to substantial evidence (including Dr. Lussier's opinions) being added to the record. (*See* AR 22–23.) Generally, where, as here, there are conflicting opinions between treating and consulting sources, the "consulting physician's opinions or report

should be given limited weight." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990).

This is particularly true where, as here, the consultant did not examine the

claimant and made their opinions without considering the relevant treating source

opinions. *See Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) ("The general

rule is that . . . reports of medical advisors who have not personally examined the

claimant deserve little weight in the overall evaluation of disability." (internal

quotation marks omitted)); *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011)

(where it is unclear whether agency consultant reviewed all of claimant's relevant

medical information, consultant's opinion is not supported by evidence of record as

require to override treating physician opinion).

      Here, Dr. Carlson could not have considered Dr. Lussier's opinions because

they were made on October 16, 2017 (AR 1902–04, 2252–55), five days after

Dr. Carlson submitted her opinions, on October 11, 2017 (AR 270–71, 274–76).  Nor

could Dr. Carlson have considered in her October 11, 2017 opinions the treatment

notes that were created after that date, including for example Therapist Stephens's

November 2017 treatment note documenting Plaintiff's "argumentative" and

"hostile" behavior and resulting in Plaintiff's termination of Stephens as a therapist

(AR 2077); and Dr. Lussier's December 2017 treatment note recording that Plaintiff

exhibited an "irritable" edge and mood along with an "anxious" affect and "vague

paranoia" (AR 2104).  Naturally, if nonexamining agency consultants have reviewed

only part of the record, their opinions "cannot provide substantial evidence to

support the ALJ's [RFC] assessment if later evidence supports the claimant's

limitations." *Ledoux v. Acting Comm'r, Soc. Sec. Admin.*, Civil No. 17-CV-707-JD, 2018 WL 2932732, at *4 (D.N.H. June 12, 2018).  And "[t]his fundamental proposition is not altered by the new regulations that empower the ALJ to 'consider whether new evidence . . . receive[d] after the medical source made his or her medical opinion . . . makes the medical opinion . . . more or less persuasive.'" *Andrea T. v. Saul*, No. C.A. No. 19-505WES, 2020 WL 2115898, at *5 (D.R.I. May 4, 2020) (quoting 20 C.F.R. § 404.1520c(c)(5)).

Accordingly, the Court finds that the ALJ erred in his analysis of the medical opinions: he should have afforded more weight to the opinions of treating sources Therapist Stephens and Dr. Lussier, and less weight to the opinions of nonexamining agency consultant Dr. Carlson.  Substantial evidence does not support the ALJ's finding that the opinions of Stephens and Dr. Lussier are inconsistent with the record, particularly regarding Plaintiff's ability to interact with others and handle stress.  Rather, these opinions are not only consistent with the record, they are also consistent with each other, a fact not acknowledged in the ALJ's decision.  Given the VE's testimony that there would be no jobs for an individual who could not interact with coworkers or the public (AR 243), the ALJ's error was not harmless and remand is necessary.

## II.   The ALJ Mischaracterized Plaintiff's Activities of Daily Living.

The ALJ also erred in his characterization of Plaintiff's activities of daily living.  In support of his decision that Plaintiff "retains the capacity to perform [medium] work" (AR 18), the ALJ relied in part on the observations of P. Goba-

Churchi, a Social Security employee who interviewed Plaintiff on May 5, 2017.

(AR 18–19, 425–26.)  In response to a request to "[d]escribe the claimant's behavior, appearance, grooming, degree of limitations, etc.," Goba-Churchi stated:

> Claimant appeared to be *very hyper and overly anxious*.  He was extremely polite.  He would look at me when he was talking or I was talking and made good eye contact.  He[] would become *distracted by the noise and traffic of the office*.  He came with a lot of medical evidence but *when asked a specific question[,] he would have to look at or try to find it in the medicals he brought*.

(AR 425 (emphases added).)  In his decision, the ALJ characterized this description of Plaintiff's behavior as reflecting that "no difficulties were observed in terms of [Plaintiff's] functioning throughout the interview" with Goba-Churchi.  (AR 19.) The ALJ continued: "[T]he . . . interviewer observed no difficulties in terms of [Plaintiff's] understanding, coherency, concentration, or in terms of his ability to answer questions," which "undermines the persuasiveness of [Plaintiff's] testimony as to the severe symptoms and mental limitations alleged."  (*Id.*)  This analysis is inaccurate.  In fact, Goba-Churchi's summary—which states that Plaintiff was hyper, anxious, distracted, and unable to answer questions about his medical history without referring to his medical records—is actually more supportive of Plaintiff's alleged limitations than it is of the ALJ's characterization of them. Although the ALJ accurately acknowledged that Plaintiff "appeared hyper and anxious" in his interview with Goba-Churchi, he minimized these deficiencies based on Goba-Churchi's finding that Plaintiff "was extremely polite" and "made good eye contact."  (AR 19.)  But surely, a person's ability to be polite and make good eye contact, although positive signs, does not effectively diminish the negative affects of

his or her hyperactivity, anxiety, lack of focus, and difficulty responding to specific
questions.

Furthermore, the ALJ inaccurately states, and indeed relies on in support of
his RFC determination, that Plaintiff acted appropriately at his medical
appointments and got along with his medical providers.  (*See, e.g.*, AR 15, 22
("[Plaintiff's] mental status exams have been generally benign"), 16 ("[Plaintiff]
could cooperate with medical and other professionals," "[t]he record reflects that
[Plaintiff] generally interacts well with his providers").)  As discussed above,
however, Plaintiff had significant difficulty interacting with his medical providers,
and those providers opined—based on their observation and treatment of Plaintiff—
that he had difficulty interacting with other people in general.  (*See, e.g.*, AR 2133,
2143, 2077.)

The ALJ correctly recognized Plaintiff's oral testimony and written reporting
that he was able to drive, go shopping, perform household chores, and care for his
children, among other activities, during the alleged disability period.  (AR 17–18, 22
(citing AR 427–42); *see* AR 233–34, 238–39.)  But Plaintiff testified that, although
he could go to the store and get a small list of groceries, he did that with his teenage
daughter or wife there to help, and he could do that only on a good day and not on
days when he was feeling bad mentally and physically.  (AR 232–33.)  Plaintiff also
testified that his wife helped him care for their children and perform other activities
of daily living including remembering to turn off the stove when cooking.  (AR

231–32.)  Moreover, Plaintiff explained that he was unable to be consistent in his ability to do these activities of daily living, meaning he could not complete them five days a week for eight hours a day, as would be expected in a work situation. (AR 233–34.)

Even accepting that Plaintiff was able to do some activities of daily living on at least a frequent basis during the alleged disability period does not extinguish his disability claim, as the Second Circuit has held that eligibility for disability benefits is not contingent on a claimant being rendered completely incapacitated.  *See Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988) ("[T]he Social Security Act is a remedial statute, to be broadly construed and liberally applied[;] . . . [thus,] a claimant need not be an invalid to be found disabled under . . . the Social Security Act." (citation and internal quotation marks omitted)).  Furthermore, Plaintiff's ability to perform the activities of daily living reflected in the record does not provide substantial evidence to support granting less weight to the opinions of Therapist Stephens and Dr. Lussier, particularly regarding Plaintiff's ability to interact appropriately with others.  *See Mahon v. Colvin*, No. 15-CV-02641 (PKC), 2017 WL 1232471, at *15 (E.D.N.Y. Mar. 31, 2017) ("[T]his heavy reliance on Plaintiff's reported daily activities of self-care, child-care, and hobbies does not provide a sufficient basis for discounting almost entirely the well-supported expert testimony of licensed psychiatrists and psychologists regarding Plaintiff's ability to sustain a job."); *Nusraty v. Colvin*, 213 F. Supp. 3d 425, 440 (E.D.N.Y. 2016) ("Because a claimant need not be an invalid to be found disabled, Plaintiff's reports

23

of her daily activities by themselves are not substantial evidence that she was not disabled and are insufficient to justify according [the treating physician's] opinion limited weight." (internal quotation marks omitted)).

Accordingly, on remand, after conducting a new analysis of the medical opinions, the ALJ should reassess Plaintiff's ability to perform activities of daily living.

## Conclusion

For these reasons, the Court GRANTS Plaintiff's motion (Doc. 10), DENIES the Commissioner's motion (Doc. 18), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 14th day of July 2020.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge